RECEIVED
USDC CLERK. CHARLESTON. SC

2006 JUN 29  A  W: 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Edward Bernard Mitchell, | ) | C. A. No. 2:04-2237-PMD-RSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Secretary Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

This employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq., is before the undersigned United States Magistrate Judge for a report and recommendation on the defendant's motion for summary judgment filed on April 3, 2006.

On July 6, 2004, the plaintiff, Edward Bernard Mitchell, sued his former employer, defendant Anthony J. Principi, Secretary, Dept. Of Veteran Affairs, and alleged that he was discharged because of his race, age, and sex, and that he was subjected to a hostile environment because of his race, age, and sex, and that he was discharged in retaliation for engaging in protected activities, all in violation of Title VII.

The defendant was not served until January 31, 2005, NS answered the complaint on March 8, 2005. After various extensions of time, discovery closed on March 6, 2006.

The defendant filed the instant motion for summary judgment on April 3, 2006. The plaintiff filed an opposition to the

1

motion on May 16, 2006, and filed various exhibits on May 17, 2006. A hearing on the motion was held before the undersigned on May 17, 2006, as well. Hence, it appears consideration of the motion is appropriate.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."

2

Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Unsupported speculation is not enough to withstand a motion for summary judgment.  Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986).  Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture.  Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 242 (4th Cir. 1982).

## STANDARD IN TITLE VII CASES

Title VII was fashioned "'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identified group of white employees over other employees... .'"  Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 95 S.Ct. 2362 (1975) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 429-30, 91 S.Ct. 849 (1971)).  Title VII now makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).

Under the disparate treatment scenario of employment discrimination, as here, a plaintiff must demonstrate that the "employer ... treats some people less favorably than others

because of their ... sex... ."  International Bhd. of Teamsters
v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n.
15 (1977).

Recently the Fourth Circuit reiterated that there are two
avenues of proof by which an aggrieved employee can prove a
disparate treatment Title VII violation.  Brinkley v. Harbour
Recreation Club, 180 F.3d 598 at 606-607 (4th Cir. 1999).  First,
an employee may utilize "ordinary principles of proof using any
direct or indirect evidence relevant to and sufficiently
probative of the issue."  Tuck v. Henkel Corp., 973 F.2d 371, 374
(4th Cir. 1992).  To overcome a summary judgment motion based
upon this method of proof, the plaintiff "must produce direct
evidence of a stated purpose to discriminate and/or [indirect]
evidence of sufficient probative force to reflect a genuine issue
of material fact."  Goldberg v. Green & Co., 836 F.2d 845, 848
(4th Cir. 1988).  "What is required is evidence of conduct or
statements that both reflect directly the alleged discriminatory
attitude and that bear directly on the contested employment
decision."  Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).
If such evidence is lacking, the plaintiff may nevertheless
proceed under McDonnell Douglas burden shifting proof scheme.
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817
(1973); see, Tuck, 973 F.2d at 374.

The McDonnell Douglas standard allocate the burdens of

4

proof.  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S.
248, 252-53, 101 S.Ct. 1089, 1093-94 (1981).  Under this
standard, the plaintiff bears the initial burden of proving by a
preponderance of the evidence a <u>prima</u> <u>facie</u> case of unlawful
discrimination: that she belongs to a minority, that he was
performing her work at a level which met his employer's
reasonable expectations, and that he suffered an adverse
employment action under circumstances which could indicate race
was not treated neutrally.[1]

   If the plaintiff makes that showing, he has established a
rebuttable presumption of unlawful discrimination.  <u>McDonnell-</u>
<u>Douglas</u>, 411 U.S. at 802.  The burden then shifts to the employer
to articulate a legitimate, nondiscriminatory reason for its
actions.  If the defendant provides such an explanation, no
presumption of discrimination remains, and the burden shifts back
to the plaintiff.  "[T]he plaintiff must than have an opportunity
to prove ... that the legitimate reasons offered by the defendant
were not its true reasons, but were a pretext for

---

[1] The Supreme Court has made it clear that because the facts
of given cases "necessarily will vary" this formula "is not
necessarily applicable ... to differing factual situations."
<u>McDonnell Douglas</u>, 411 U.S. at 802, n. 13; See <u>O'Connor v.</u>
<u>Consol. Coin Caterers Corp.</u>, 517 U.S. 308, 312, 116 S.Ct. 1307
(1996).  What is critical with respect to the fourth element is
that the plaintiff demonstrate he was not hired, or fired, or not
promoted "under circumstances which give rise to an inference of
unlawful discrimination." <u>Texas Dept. of Comty. Affairs v.</u>
<u>Burdine</u>, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981).

discrimination."  Burdine, 450 U.S. at 253, 101 S.Ct. 1089.

The Supreme Court recently clarified the plaintiff's burden at the pretext stage in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S.Ct. 2097 (2000).  The Court reiterated that evidence of pretext, combined with the plaintiff's prima face case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination."  Id. at 2108 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519, 113 S.Ct. 2742 (1993)).  However, the Reeves Court made plain that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Id. at 2109.

The plaintiff also brought a claim that he was terminated because he accused Rogers of failing to investigate and punish McMasters as a result of Plaintiff's complaints because of Rogers' racial animus.  The Opposition Clause of Title VII makes it "an unlawful employment practice for an employer to discriminate against any of its employees ... because he has opposed any practice made an unlawful employment practice by this subchapter...."  42 U.S.C. § 2000e-3(a).  The series of proofs and burdens outlined in McDonnell Douglas Corp. v. Green, 411

U.S. 792, 802, 93 S.Ct. 1817(1973), apply to retaliation claims under § 704(a). <u>See</u>, <u>Karpel v. Inova Health Sys. Servs</u>., 134 F.3d 1222, 1228 (4th Cir. 1998). To establish a <u>prima facie</u> claim of retaliation under Title VII, a plaintiff must establish (1) that he engaged in protected activity, (2) that he was subject to an adverse employment action, and (3) that there was a causal link between the two. <u>Beall v. Abbott Labs.</u>, 130 F.3d 614, 619 (4th Cir. 1997). The burden then shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse action. <u>Beall</u>, 130 F.3d at 619. If the employer does so, the plaintiff must then demonstrate that the employer's reason was pretext for retaliation by proving both that the reason was false, and that retaliation was the real reason for the challenged conduct. <u>Beall</u>, 130 F.3d at 619. However, under appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Equal Employment Opportunity Comm'n v. Sears Roebuck and Co.</u>, 243 F.3d 846, 852 (4th Cir. 2001) (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148, 120 S.Ct. 2097 (2000)).

## DEFENDANT'S GROUNDS FOR SUMMARY JUDGMENT

The defendant argued he is entitled to judgment as a matter of law because:

7

(1)   Plaintiff cannot establish disparate treatment.

(2)   Plaintiff cannot establish retaliation as a reason for the termination of his employment.

(3)   Plaintiff's action is barred by issue preclusion after his settlement in the Whistleblower action.[2]

## FACTS

The facts either undisputed or as presented by the plaintiff, with all reasonable inferences drawn in favor of the plaintiff, to the extent supported by the record, are as follow.

Nurse Manager Letha Rogers, a black female, interviewed and hired plaintiff, a black male born in 1955, to work in the Surgical Intensive Care Unit ("SICU") at the Ralph Johnson VA Medical Center in Charleston, South Carolina as a temporary probationary employee beginning August 29, 1999.  Nurse Manager Rogers was also plaintiff's supervisor while he worked at the VA and was the decision maker who terminated plaintiff's employment nine months after she hired him.  When hired, plaintiff was informed that his appointment was temporary[3]:

> Your appointment is temporary, not-to-exceed thirteen months and subject to renewal at that time for an additional 13 months.  Temporary

---

[2] Defendant withdrew this ground at oral argument.

[3]  If Plaintiff had finished his temporary assignment and been rehired for another temporary assignment, he would then have been considered a permanent federal employee. The temporary assignments can last up to five years. (Pl. dep. p. 135-136).

8

>appointments are necessary due to current workload
>and budget considerations.  They may be
>terminated, if necessary at any time up to the
>expiration date of the appointment. . . .

Ex. 1, letter of August 26, 1999.

Plaintiff's duties as an R.N. in the SICU working under the charge nurse on duty included monitoring patients, giving drugs, and reporting to the doctors.  After a month of initial orientation, plaintiff worked the night shift, from 7 p.m. until 7 a.m.  After three weeks on the night shift, plaintiff began observing that the two charge nurses who worked weekends, Bill McMaster, a white male, and Kathy Bunting, a white female, "didn't do anything for the patients.  That was where the problem was.  They were abusive to the patients.  They wouldn't do anything for the patients.  I would report them."  Plaintiff testified that he got along with everyone until the third or fourth week on the floor when he started making complaints to Rogers that the patients were mistreated.[4]  Then, after the multiple complaints started, plaintiff believes that most of the other nurses, some of whom were black and some of whom were male, did not want to work with him.  Plaintiff testified that McMaster had twenty years experience in the job, had once trained Rogers before she was promoted and had "some kind of authority over

---

[4] During his orientation period, he had been told to report patient abuse. (Pl. Dep., pp. 61-68).

9

her". (Pl. dep. p. 78). Plaintiff believes that McMaster was "the culprit of all the problems." (Pl. dep. p. 62).

Although plaintiff deposed that he believed that Rogers did not counsel or discipline the nurses about whom the plaintiff complained, he has no basis to know, and does not actually know, if any nurses were counseled or disciplined as a result of his numerous complaints to Rogers. Rogers would thank him for his complaint and say, "I'll take care of this" or "I'll handle it." (Pl. dep. p. 83). Plaintiff recalled reporting to Rogers three major events of patient mistreatment by McMaster. McMaster threatened a patient, Mr. Pie who was combative and had scratched or pushed McMaster and may have hurt Bunting too. McMaster told Pie, "If you do that again, I'm gonna beat your ass." (Pl. Dep. pp. 72-75).

Plaintiff reported that during an emergency, McMaster would not let a patient onto SICU because he wanted him to go to the Medical Intensive Care Unit (MICU). The patient did not die as a result of the delay but plaintiff believed that the patient could have died. (Pl. Dep., pp. 76-79).

Plaintiff also recalled that McMaster pushed a patient down on the bed which was dangerous because the patient had a Swan-Ganz type of catheter into his heart. Again, he reported the incident to Rogers. Again, plaintiff is unaware of any investigation into his reports and is unaware if any counseling

10

or discipline resulted from his reports.  (Pl. Dep., pp. 80-83).

Denise R. Carey, Nurse Executive, Nursing and Patient Care
Services concurred with Rogers that plaintiff's temporary
appointment should be terminated and wrote him a letter which
Rogers delivered to that effect:

> SUBJ:   TERMINATION OF TIME LIMITED APPOINTMENT
>
> 1.   On August 29, 1999, you were hired as a Staff
> Nurse, AD-6 10-Il, on a time limited appointment
> not to exceed (NTE) September 28, 2000, to
> accommodate fluctuating staffing needs.  You were
> advised of the facts about temporary appointments
> and that your appointment was subject to
> termination at any time.
>
> 2.   This is to inform you that your temporary
> appointment will terminate on July 21, 2000.  By
> the end of your last scheduled shift prior to this
> date you must clear indebtedness, and return all
> VA property in your possession.
>
> 3.   Please be advised that before your final
> paycheck is released, you are required to properly
> clear this Medical Center, and return all VA
> property issued to you such as badge, keys, and
> uniforms.
>
> 4.   You are thanked for your services rendered to
> this Medical Center and veteran patients, and you
> are wished well in your future endeavors.

When Rogers gave plaintiff the letter, he demanded to know
the reason behind the decision.  Rogers told the plaintiff it was
because "[his] skills was substandard."  (Pl. dep. p. 101).
Plaintiff refused to sign the letter and Rogers noted that he
"wants more documentation for reasons he is being fired."

11

There were five incidents that the defendant cites in support of its contention that plaintiff was fired because of performance issues:

1. In December 1999, plaintiff was accused of delaying a patient's placement in SICU for an hour after the doctor ordered the transfer. (Pl. Dep., p. 79). Plaintiff explained that McMaster was the Charge Nurse that night and when he came on shift, McMaster said, "here, this is your assignment." Plaintiff felt that McMaster was "one hundred percent disrespect[ful]" (Pl. Dep. p. 226). Plaintiff knew that the doctor had ordered this patient moved from a bed on the MICU ward to SICU; however, in plaintiff's view, there was no hurry because the patient was in no distress. Plaintiff knew some of the patient's history and felt he needed observation. For this reason, plaintiff and the ward nurse who was transferring the patient, agreed to hold up the transfer until the room in front of the SICU nurse's desk could be made up for the patient, instead of placing him in an open room further away for the desk. McMaster reported the delay in transferring the patient to Rogers, and Rogers asked plaintiff about the incident. Plaintiff told her that McMaster's account was a lie and that "the patient was fine". (Pl. Dep., pp. 217-228).

2. When plaintiff came on duty in early February 2000, he went to Patient Grooms's room and asked him how he was. When

12

responded that he was "fine," plaintiff noticed that the

endotracheal tube (ETT), intubation through the mouth into the

trachea which prevents a patient from speaking when in place, was

dislodged in his mouth.  Plaintiff notified the resident, Dr.

Leopold, that the ETT was dislodged.  As a resident, Dr. Leopold

is considered a student.  Plaintiff advised Dr. Leopold not to

reintubate the patient because he was in no distress and his gas

levels were good unassisted; as he testified, "me and Stanley

[Greenwald, the respiratory therapist] told him we know the tube

is out, we can just finish pulling it out."  The resident was

indecisive about what to do and plaintiff went on to his other

duties.  Hours later the decision was made by the resident to

remove the tube.  Thereafter, the decision was made to reintubate

the patient and the patient died.  (Pl. Dep., pp. 230-235).  By

memorandum dated February 2, 2000, Supervisor Rogers memorialized

this incident, concluding,

> I inquired of Mr. Mitchell the reason it took
> two hours to decide to remove the tube.  Mr.
> Mitchell stated he felt the intern was
> informed, was in the unit and communicating
> with his chief resident that all bases were
> covered.  He did not feel the need to call
> the resident or attending to make the
> decision to remove the tube.  I have counsel
> Mr. Mitchell, RN concerning the importance of
> notifying the chief resident or attending
> when interns are indecisive.  I stressed to
> Mr. Mitchell that this is his responsibility
> as a patient advocate and staff nurse at this
> institution to demand a decision concerning a
> patient condition.

13

Pl. Dep. Ex. 1, p. 5.

Plaintiff says that he tried to talk with Rogers about the ETT incident, but she walked off. Plaintiff testified that two weeks later, Rogers told him he should have been the patient's advocate. (Pl. Dep., pp. 236-239).

3. On May 22, 2000, plaintiff gave Versed to a patient (Patient F2422) after the doctor had ordered that the drug not be given. Plaintiff testified that when he came on duty the patient "was acting like he was in bad pain and . . . was so disgruntled, he was just trashing the bed." Although plaintiff knew the doctor was trying to wean the patient off the drugs, plaintiff did not take the time to look on the computer to see what the doctor had ordered before plaintiff's shift began. (Pl. Dep., pp. 242-243). When plaintiff did look at the computer he saw that the drug had been ordered stopped by the doctor. Plaintiff phoned the doctor and told him what had happened and the doctor was angry. Plaintiff admitted that he gave the patient 10 milligrams of Versed without an order. (Pl. Dep., p. 284). The patient had a deadly stroke after receiving the Versed. The Hospital investigated the death and concluded: "There appears to be a distinct medication error associated with his care in the SICU post-operatively. The issue of 'marginal hemostasis' also raises some concerns." (Ex. 2 to Pl. dep., p. 27). Rogers

14

formally discussed this incident with Plaintiff on June 23, 2000.
(Ex. 2, p. 6).

4.   On May 24, 2000, plaintiff failed to document continued
bladder irrigation ("CBI") and urine output properly.   The
patient had recently experienced prostate surgery and his bladder
was being irrigated as part of his post operative care.
Plaintiff recalled that the staff was flushing the patient's
kidneys with saline following surgery, running 3,000 cc of saline
through the Foley catheter.   It was important to measure the
outputs, subtracting the saline from the total output to
determine the amount of urine the body was producing.   (Pl. Dep.
pp. 256-261).   Plaintiff's notes of the patient's intake and
output on May 25, 2000, showed that the patient's urine output
was 12,000 cc over the shift.   (Pl. Dep., p. 276).   Plaintiff had
entered the total output as urine without subtracting the saline
from the total output.   Plaintiff deposed that he could offer no
explanation for his error:   looking at the amount of urine he had
recorded, plaintiff acknowledged, "the patient could not have
been peeing then.   I don't know.   I'm trying to go from memory."
(Pl. Dep. p. 262).

5.   The doctor's orders for patient Pie on June 14, 2000,
were, "Do not manipulate NG (nasogastric tube) w/o calling M.D."
(Pl. Dep. pp. 277-279).   On June 17, 2000, plaintiff replaced
Pie's NG tube without calling Pie's doctor.   Plaintiff explained

15

that the tape holding the tape to the patient's nose was loose and the tube popped up or came out and that Dr. Leopold, the intern, was at bedside and told him to do it.  (Pl. Dep. pp. 265-268).  However, plaintiff failed to document that Dr. Leopld was there at bedside when he manipulated/or made the adjustment to the tube.  (Pl. Dep., p. 92).  Plaintiff says he did not know about the doctor's order of June 14th not to manipulate NG tube. (Pl. Dep. p. 268).

Rogers received complaints that plaintiff manipulated the patient's NG tube.  Review of plaintiff's nursing notes revealed that he did not note that the intern had told him to do it. Rogers formally discussed this issue with plaintiff on July 6, 2000.  (Ex. 2, p. 17).  When confronted, plaintiff acknowledged that manipulating an NG tube could traumatize a patient.  (Pl. Dep. p. 87).  However, plaintiff said that, "Although didn't document it, I'll be truthful, I did not document it because it weren't an issue.  We only put stuff down that would matter, okay?"  (Pl. dep. 262).

Plaintiff's employment terminated on July 21, 2000.  (Ex. 4).  Plaintiff made an initial contact with the EEO Counselor on July 7, 2000, claiming discrimination on account of race.  (Ex. 5).  Later his charge claimed harassment and discrimination on account of race, age, and gender.  (Ex. 6).  Plaintiff does not know of anybody who was in probationary status who had received

16

allegations of bad patient care and who was not disciplined. (Pl. Dep. p. 109, 110, 150). Similarly, plaintiff does not know if any other SICU nurse was ever disciplined. (Pl. Dep. p. 149, 150). A MICU white female nurse not on probation, Sharon Collins, was fired for sleeping on the job. (Pl. dep. p. 150).

The plaintiff claims that other nurses were telling Rogers that he was a bad nurse and "lying on him" in retaliation for his complaints against them. (Pl. dep. p. 101, Pl. aff. para. 25). An unnamed person told Rogers that plaintiff was "hopeless." (Pl. aff. para. 18).

The plaintiff's complaint that he was discriminated on the basis of his gender is that female nurses were offered charge nurse training and recovery room training "several times" and he was not. When he complained, Rogers explained that the hospital could not afford to so train him; it is undisputed that the plaintiff was never a candidate for charge nurse and that he never performed any work in the recovery room. (Pl. dep. p. 150, 151).

Plaintiff's age discrimination claim is that another probationary nurse, Laurie Eaton, who was younger, was assigned to the day shift. Plaintiff's own opinion is that she should have been assigned to the night shift and worked her way up in seniority to the day shift.

17

Plaintiff's retaliation claim is that he accused Rogers of racial discrimination because plaintiff believes that Rogers did not punish McMaster for holding up a coding patient from coming into the SICU.  As a result of this accusation, plaintiff was thereafter terminated, according to the plaintiff.  (Pl. aff. para. 25).  Plaintiff claims his complaint to Rogers that Rogers discriminated on the basis of race is activity protected under Title VII.

Plaintiff had previously settled a Whistleblower action against the VA which alleged patient abuse in the three events involving McMaster pushing and threatening patient Pie; McMaster not allowing the coding patient into SICU but referring him to MICU; and possibly McMaster pushing the patient with a Swan-Ganz catheter.  (Pl. Dep., pp. 121-123, 130-131).  Plaintiff states that he was terminated because of his complaints to Nurse Manager Rogers and the subsequent retaliation:  "I know why I was terminated, because I kept telling them Letha, he's not doing anything and these guys retaliating on me."  (Pl. Dep., p. 101). Plaintiff testified that "[t]hey [McMaster and Bunting] didn't do anything for the patients.  That was where the problem was.  They were abusive to the patients.  They wouldn't do anything for the patients.  I would report them."  (Pl. Dep., pp. 61, 65-66). Plaintiff recalled hearing that a doctor ordered Kathy Bunting, R.N., to advance a swan catheter and that Bunting had done it,

even though advancing a swan is outside the scope of nursing practice.  Plaintiff reported the incident the next morning. (Pl. Dep., p. 97, 99).  He believes that he was terminated in retaliation for his claims about Bill McMaster, Jeff (unknown last name) and Kathy Bunting.  All of the events underlying his EEO claims were brought up in the Whistleblower action.  (Pl. Dep. pp. 120-123).  The Whistleblower case was first filed with the Office of Special Counsel (OSC) and later with the Merit System Protections Board. Plaintiff asked the Office of Special Counsel to look into the incident where he allegedly delayed an patient's transfer to SICU.  On or about May 1, 2003, plaintiff and the agency settled the MSPB Whistleblower action.  (Pl. Dep. pp. 128, 293-294).

## DISCUSSION

Here there is no issue of genuine material fact.  The evidence taken in the light most favorable to the plaintiff shows him to have been a temporary employee, who performed below his employer's reasonable expectation, if not below the level of acceptable medical care.  The only issue of race, age, or gender in the work place is attributable solely to the plaintiff's raising race, age, or gender as an issue.

The plaintiff's complaints are unsupported speculation, and there is no evidence that could lead a rational trier of fact considering the record as a whole to find for the plaintiff.

19

The general standards for summary judgment naturally inform any assessment of whether a plaintiff has provided sufficient evidence of discrimination such that his case may proceed to trial.  See, e.g., Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005); Mereish v. Walker, 359 F.3d 330, 339 (4th Cir. 2004).  As the Supreme Court has made clear, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'"  Reeves, 530 U.S. at 148 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)).  Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  "Together, the genuineness and materiality requirements express the sound proposition that litigation for its own sake is not a judicious use of resources."  Hux v. City of Newport News, Virginia, ___ F.3d ___, 2006 WL 1719525 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)).

## CONCLUSION

Accordingly, for the aforementioned reasons, it is recommended that the defendant's motion for summary judgment be granted and this matter ended.

Respectfully Submitted,

Robert S. Carr
United States Magistrate Judge

Charleston, South Carolina
June 28, 2006

20